UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

HEATHER CARPENTER and
JULIO JOSE JIMENEZ-ARTUNDUAGA;

Plaintiffs,

-against-

THE CITY OF NEW YORK, CHIEF OF DEPARTMENT
JOSEPH J. ESPOSITO, CHIEF OF PATROL JAMES P.
HALL, SGT. ROBERT BRYNE, Shield #247,
SGT. CHRISTOPHER NEWSOM, Shield # 201, SGT.
RODRIGUEZ, and SGT. PATRICK WRIGHT, Shield
#1332,

Defendants.

-----------------------------------------------------------------------x

**DEFENDANTS' LOCAL
RULE 56.1 STATEMENT
OF UNDISPUTED FACTS**

11 Civ. 8414 (DLC)

Defendants City of New York, Retired Chief of Department Joseph J. Esposito,

Chief of Patrol James P. Hall, Sergeant Robert Bryne, Sergeant Christopher Newsom,

Sergeant Rodriguez, and Sergeant Patrick Wright, by their attorney Michael A. Cardozo,

Corporation Counsel of the City of New York, submit this statement pursuant to Rule 56.1

of the Local Civil Rules of the United States District Court for the Southern District of

New York, setting forth the material facts to which they contend there is no genuine issue

to be tried.

## ZUCOTTI PARK: DRESS SHARP

1.     On October 15, 2011, as part of a *Global Day of Action*[1] taking place around the

world; Occupy Wall Street (OWS) organizers planned massive demonstrations throughout

---

[1] On October 15, 2011, Occupy organizers and supporters held global demonstrations in more than 1000
cities in 82 countries (see *October 15th, United For #GLOBALCHANGE*, http://15october.net/). In
partnership with these global events; Organizers of the Occupy Wall Street Movement in New York posted a
"call to action" event on their Facebook page called a "Day of Action Against Banks". The organizers for

New York City. (See *October 15th International Day of Action*,

http://occupywallst.org/oct15/ ).

2.      In preparation for the demonstrations taking place throughout the day, OWS

organizers distributed business suits and protest buttons which read "Dress Sharp" in

Zucotti Park. (See Deposition Transcript of Heather Carpenter (hereinafter "Exhibit A"),

annexed to the Declaration of Joy Anakhu ("Anakhu Decl.") as "Exhibit A" at 28:25-29:1;

87:20-24; Deposition Transcript of Julio Jimenez-Artunduaga ("Exhibit B") annexed to

Anakhu Decl. as "Exhibit B" at 44:9-14). The business suits and buttons were provided to

protest participants so that they would look more presentable when presenting their various

messages to the public at large.  (Exhibit A, 28:19-24).

3.      Many protestors, including the plaintiffs, slept in Zucotti Park the night before the

massive demonstrations and had changed into business suits provided to them by OWS

organizers on the morning of October 15, 2011. (Exhibit A, 28:19-20; 34:2-7; 35:24-25);

Exhibit B, 38:17-19).

4.       The Plaintiffs, a couple that were engaged to be married at the time (see Plaintiffs'

Third Amended Complaint, ("Exhibit Q") annexed to Anakhu Decl. as "Exhibit Q" at ¶

15), spent the night in Zucotti Park with the intent of participating in the demonstrations

taking place the following day. (Exhibit A, 34:2-25; 35:1-4).

## WASHINGTON SQUARE PARK

5.      As part of the massive protests taking place on October 15, 2011, OWS organizers

planned a demonstration against "big banks" (Exhibit Q, ¶ 19).

---

this event called upon fellow occupiers and supporters to join them at various local banks on October 15,
2011, to protest a myriad of issues including but not limited to student loans, bank fees, the environment and
the funding of wars. (See Occupy Wall St., *October 15th Day of Action Against Banks*, October 10, 2011,
https://www.facebook.com/notes/occupy-wall-st/october-15th-day-of-action-against-
banks/213561258711646).

6.     As part of this demonstration, protesters, including the plaintiffs, assembled in Washington Square Park where they planned to march to local bank branches (Id.). The intent of the march was to protest excessive fees and predatory lending from banks such as Citibank and Chase (Id.).

7.     Some of the protestors, including plaintiff Heather Carpenter ("plaintiff Carpenter"), planned to not only participate in the demonstrations but also close their bank accounts (Exhibit Q, ¶ 21; Exhibit A, 33:13-20).

8.     On October 15, 2011, plaintiff Carpenter was an account holder at Citibank (Exhibit A, 38:23-24); however, plaintiff Julio Jimenez-Artunduaga ("plaintiff Jimenez") was not (Exhibit B, 57:17-20).

9.     Several officers of the New York City Police department ("NYPD"), including the defendants, were also in attendance at the assembly in Washington Square Park where they observed the demonstration and the protestors. (Deposition Transcript of Sergeant Rodriguez ("Exhibit C"), dated December 5, 2012, annexed to Anakhu Decl. as "Exhibit C" at 44:12-22; 45:5-6; Deposition Transcript of Retired Chief of Department, Joseph Esposito ("Exhibit D") annexed to Anakhu Decl. as "Exhibit "D" at 101:25-102:2-3, 14-20; Deposition Transcript of Chief of Patrol, James P. Hall ("Exhibit E"), dated January 25, 2013, annexed to Anakhu Decl. as "Exhibit E" at 114:24-115:4; 116:7-19; (Deposition Transcript of Sergeant Christopher Newsom ("Exhibit T"), annexed to Anakhu Decl. as "Exhibit T" at 28:17-22; 40:6-13).

10.     Prior to the event, officers received information from the NYPD Intelligence Division ("INTEL") that an OWS demonstration would take place on October 15, 2011. (Exhibit D, 62:9-12). Officers were also informed that as part of this demonstration,

protestors may attempt to disrupt normal bank operations (Exhibit D, 75:17-24; ; Exhibit E, 83:18-84:3; Exhibit C, 38:8-14) .

11.    While at Washington Square Park, officers observed several protestors branch off from the larger assembly; form smaller groups and leave the park (Exhibit C, 45:15-19; 63:2-9).

12.    Sergeant Rodriguez, dressed in plainclothes, was instructed by his superiors to join one of the small groups and "blend in".  (Exhibit C, 45:13-21; 52:10-14). Sergeant Newsom was also given similar instructions (Exhibit T 41:14-22).

13.    The group Sergeants Rodriguez and Newsom followed were headed to a local Citibank branch (Exhibit T, 48:12-17).

## CITIBANK

14.    After leaving Washington Square Park, approximately 30-35 OWS protestors, including the plaintiffs, marched to a local Citibank branch located at 555 LaGuardia Place, New York, New York. (Exhibit A, 39:9-13; Exhibit B, 52:13-19). Plainclothes police officers were among the protestors as they headed towards Citibank (Exhibit C, 70:16-24).

15.    While marching to the Citibank location, protestors chanted and carried signs (Exhibit C, 69:24-70:3; 71:9-11). Some protestors, including plaintiff Jimenez, carried video recorders and filmed the demonstrations (See generally, video recording taken by plaintiff Jimenez of the October 15, 2011 events,  ("Exhibit K") annexed to Anakhu Decl. as "Exhibit K"; see also generally, video recording inside of Citibank ("Exhibit L"), annexed to Anakhu Decl. as "Exhibit L").

16.     As they approached the Citibank location; the plaintiffs and other protestors began

chanting slogans such as "Banks Got Bailed Out!" followed by "We Got Sold Out!"(

Exhibit B, 51:14-19; Exhibit A, 42:6-18). Other chants included "Whose Streets?" "Our

Streets!" "We're the 99 percent!" (Exhibit C, 70:6-7). Many members of the group

continued to chant loudly while entering Citibank (Exhibit A, 42:11-18).

17.     Sergeant Rodriguez observed that there were approximately ten Citibank customers

in the bank when the protestors arrived.  (Exhibit C, 83:21).

18.     Sergeant Rodriguez immediately telephoned his superiors to inform them that the

protestors had entered a local Citibank branch (Exhibit C, 78:14-18).

19.     Sergeant Rodriguez observed plaintiff Carpenter and plaintiff Jimenez among the

protestors in the Citibank branch. (Exhibit C, 72:16-19).  Plaintiff Carpenter was

noticeable to Sergeant Rodriguez because her "hair was very red". (Exhibit C, 72:22-24).

Sergeant Rodriguez noted that plaintiff Jimenez "was evident because he was videotaping"

(Id.). Sergeant Rodriguez believed that both plaintiffs were together due to the way they

interacted with one another (Exhibit C, 74:10-12; 19-21).

20.     Although Sergeant Newsom did not observe plaintiff Carpenter among the

protestors, he did observe plaintiff Jimenez with the protest group (Exhibit T, 55:17-23).

Sergeant Newsom also observed him videotaping the demonstration (Exhibit T, 63:16-23).

21.     As protestors filed into the bank, they continued to chant loudly while forming a

large circle in the center of the branch. (Exhibit C, 78:21-79:3; 98:13-16). They also

blocked the reception area (Exhibit C, 99:15-20).

22.     After protestors quieted down, a member of the group welcomed everyone to what

he described as a "flash mob"[2]. He then conducted a teach-in where protestors were

encouraged to use the Citibank location as a speaking place for issues. (Exhibit K, 1:20-

3:32).

23.     After the flash mob was announced; many protestors stepped forward and spoke

generally about banks, student loans, the environment and their personal experiences.

(Exhibit K, 3:43-6:04).

24.     These speeches were conducted in the middle of the bank and were followed by

loud cheers, as well as hand clapping from other protestors. (Exhibit C, 101:9-13).

Sergeant Rodriguez noted that as the demonstration took place, actual Citibank customers

began leaving and walking out (Exhibit C, 98:6-12; 102:21-22).

25.     During the demonstration; plaintiff Jimenez is seen filming protestors and bank

personnel (Exhibit C, 107:2-7; see also generally, Exhibit L). He is also seen walking

behind the customer service counter (Exhibit L at 00:52). Plaintiff Carpenter participated

in the protest activities by clapping her hands and chanting with other protestors (Exhibit

C, 107:8-11).

26.     Within minutes of protestors arriving at the bank, Citibank Branch Manager,

Marissa Phillips, asked them to stop video taping and leave the premises.  (Exhibit K, from

4:44-4:55) (Exhibit L at 2:54).

27.     Plaintiff Carpenter and plaintiff Jimenez both acknowledged hearing the request

made by bank personnel to leave the premises (Exhibit A, 44:19-22; Exhibit B, 53:24-

54:2). Plaintiff Jimenez also heard the manager' request that protestors stop filming

---

[2] A flash mob is defined as a group of people summoned (as by email or text message) to a designated
location at a specified time to perform an indicated action before dispersing. "Flash Mob", Merriam-
Webster.com.2013, http://www.merriam-webster.com (10 June 2013).

(Exhibit B, 54:14-18); however, he continued to do so (see generally Exhibit L after 3:09; see also generally, Exhibit K after 4:44)

28.     Despite hearing the initial warning to leave bank premises, the plaintiffs and other protestors remained (Exhibit K, 4:44; Exhibit L from 3:00). Some protestors even encouraged others to continue giving speeches (Exhibit L, 3:05-3:11; Exhibit K,  4:53); while others verbally challenged the bank manager's request to stop filming by suggesting, in sum and substance, that they [protestors] had a right to film because there were security cameras installed in the bank (Exhibit L, 3:03-3:05; Exhibit K, 4:48-4:50).

29.     By the time protestors were given the initial warning to vacate bank premises, plaintiff carpenter had not yet approached a bank teller to close her account (Exhibit A, 46:14-15). Sergeant Newsom noted that after the initial warning was made; plaintiff Jimenez remained within the bank and continued to video tape while circulating amongst other protestors (Exhibit T, 266:18-25).

30.     Several warnings are made by various bank managers for protestors to leave the branch. (Exhibit B, 54:25-55:9; Exhibit A, 46:14-16; Exhibit L, 2:54-3:34; Exhibit C, 121:12-16).

31.     After repeated warnings were ignored by protestors, Citibank employees placed at least three telephone calls to the police. (See Sprint Report annexed to Anakhu Decl. as "Exhibit J"). A fourth call was made on the bank's behalf by their security company, ADT (Id.).

32.     After several warnings were given, and at least one phone call was already placed to 911, plaintiff Jimenez approached plaintiff Carpenter and instructed her to close her account (Exhibit K, 5:10-5:31; Exhibit B, 56:7-8; Exhibit A, 89:23-25).

33.     Plaintiff Jimenez testified that he approached plaintiff Carpenter with her bank card after hearing the warnings because he "was afraid that they were going to arrest us" and "didn't want any trouble" (Exhibit B., 56:7-8).

34.     Plaintiff Carpenter approached a bank teller and began closing her account (Exhibit K, 6:07).  Although the teller assisted plaintiff Carpenter in closing her account, they had no authority to override the request of the bank manager(s) that she and other protestors leave the premises (see Affidavit of Citibank Area Director George Maloney, dated May 30, 2013, annexed to Anakhu Decl. as Exhibit R).

35.     While plaintiff Carpenter closed her Citibank account; plaintiff Jimenez returned to the group of protestors and continued to videotape the demonstration (Exhibit K, 6:19).

36.     Shortly after Citibank employees called 911, additional plainclothes NYPD officers arrived and spoke to bank personnel (Exhibit K, 8:54).  Plaintiff Jimenez is seen exiting the bank branch after they appeared. (Exhibit K, 9:23).

37.     As officers entered, there are still protestors inside the bank (Exhibit K, 8:54). Plaintiff Carpenter is one of the protestors still inside the bank when officers arrived (Exhibit A, 48:20-25; see also generally a copy of a video recording attached to Plaintiffs' Amended Complaint(s) as *Exhibit A*, annexed to Anakhu Decl. as "Exhibit M").

38.     After speaking to Citibank employees, police officers and security personnel blocked the entrance of the bank. (Exhibit K, 10:17). Upon seeing officers close the bank doors, plaintiff Jimenez yelled out to the protestors in the bank "they are closing the doors!" (Exhibit K, 10:04; Exhibit B,128:10-12).

39.    At that time, officers informed protestors within the bank that they were no longer allowed to leave (Exhibit M, 00:17). Citibank customers that were not involved with the demonstration were allowed to leave (Exhibit M, 00:13).

40.    As Plaintiff Carpenter finished closing her account she heard someone yell out that the bank doors were being closed and that protestors were not allowed to leave (Exhibit A, 48:22-25). Plaintiff Carpenter was aware that plainclothes officers were blocking the bank doors (Exhibit A, 48:18-19).

41.    Fearing she would be arrested, Plaintiff Carpenter, dressed in the business suit she borrowed earlier at Zuccotti Park, approached police officers at the door and informed them she was a customer. (Exhibit A, 51:13-14; 62:2-3).

42.    To support her claims, plaintiff Carpenter held up her transaction receipt as well as bank card and showed them to the officers. (Exhibit A, 55:7-8). The officers at the door, unaware at the time that plaintiff Carpenter was involved in the demonstration, allowed her to exit the bank ( see Exhibit M from 00:00-00:10).

43.    Plaintiff Carpenter was aware that officers would not have allowed her to leave the bank if they had been aware that she was associated with the demonstration (Exhibit A, 54:9-14).

44.    Sergeant Rodriguez was not among the officers blocking the bank doors as plaintiff Carpenter exited (Exhibit A, 56:15-17).

45.    Other protestors asked and even attempted to leave; however, they were turned away by officers positioned at the front door of the bank. (see generally Exhibit M ).

46.    Retired Chief of Department, Joseph Esposito ("Chief Esposito"), arrived shortly after bank doors were closed, along with other member of the NYPD (Exhibit M, 00:56).

After conferring with other officers at the scene; Chief Esposito informed the protestors that they were under arrest (Exhibit M, 2:00). Protestors were arrested for criminal trespass. (Exhibit M, 6:02).

47.    Shortly after exiting the bank; plaintiff Carpenter was approached by Plaintiff Jimenez (Exhibit K, 12:13). In sum and substance, the following conversation occurred between them (Exhibit K, 12:14):

> Plaintiff Carpenter: *"I fucked up"*
>
> Plaintiff Jimenez: *"why?"*
>
> Plaintiff Carpenter: *"I told them I was a customer. I feel bad but..."*
>
> Plaintiff Jimenez: *"You told them you were a customer?"*
>
> Plaintiff Carpenter: *"I was going to get stuck"*
>
> Plaintiff Jimenez: *"Well it's good that you told them you were a customer because they're going to kidnap people in there"*

48.    Plaintiff Carpenter then expressed remorse for "bailing" from the remaining protestors inside the bank, but indicated that she could not *"afford to get arrested"*. (Exhibit K, 12:31).

49.    Plaintiff Jimenez then assured Plaintiff Carpenter that she did not "bail" on the group and that the other protestors remained on their own volition after bank personnel asked them to leave. (Exhibit K, 12:33; Exhibit B, 128:17-20)

50.    Both plaintiffs stood in front of the bank windows and recorded  the remaining protestors that were still inside (Exhibit B, 76:21-77:4).

51.    Sergeant Rodriguez is inside the bank and facing bank windows (Affidavit of Sergeant Rodriguez, dated June 13, 2013, annexed to Anakhu Decl. as  "Exhibit G" at ¶ 5).

While facing the windows, Sergeant Rodriguez looked outside and recognized the plaintiffs as two protestors that had participated in the bank demonstration (Id.).

52.     Sergeant Rodriguez immediately informed Chief Esposito that the plaintiffs had been involved in the demonstration and had somehow managed to get outside. (Exhibit G, ¶6) (Exhibit D, 186:4-8).

53.     Chief Esposito instructed Sergeant Rodriguez to  bring the plaintiffs back into the bank and arrest them for criminal trespass (Exhibit G, ¶7).

54.     Sergeant Rodriguez then exited the bank and approached the plaintiffs (Exhibit G, ¶8).

55.     Sergeant Newsom already outside of the bank; observed Sergeant Rodriguez exit the bank (Exhibit T, 127:24-128:2). Sergeant Newsome accompanied Sergeant Rodriguez as he engaged the plaintiffs (Exhibit T, 130:8-13).

56.     Sergeant Rodriguez informed the plaintiffs that he was a police officer and had observed them participating in the demonstration inside the bank (Exhibit G, ¶ 9). He informed both plaintiffs that they were under arrest (Id.)

57.     Sergeant Newsom recognized plaintiff Jimenez as a protestor he had observed earlier participating in the demonstration within the bank (Exhibit T, 129:11-14).

58.     Plaintiff Carpenter recognized Sergeant Rodriguez as an individual that marched with the protest group to Citibank (Exhibit A, 56:13-14). She believed he was with the group as they mobilized at Washington Square Park (Exhibit A, 56:11-12).

59.     A brief argument ensued between Sergeant Rodriguez and the plaintiffs. (See a copy of a video recording taken outside of Citibank on October 15, 2011, annexed to Anakhu Decl. as "Exhibit N" at 1:26).

60.     Plaintiff Carpenter repeatedly stated that she was a customer and displayed her receipt (Exhibit A, 59:17-19; 62:23-24). Plaintiff Jimenez informed Sergeant Rodriguez that plaintiff Carpenter was his girlfriend. (Exhibit B, 79:11-12).

61.     While Sergeant Rodriguez attempted to lead plaintiff Carpenter back into the bank in order to place her under arrest, plaintiff Jimenez stepped in between them  (Exhibit N, 1:37).

62.     With his back towards Sergeant Rodriguez; Plaintiff Jimenez placed his arm around plaintiff Carpenter and attempted to lead her away from the officer. (Exhibit B, 126:23-127:2; Exhibit N, 1:38). Seeing that the plaintiffs were attempting to escape, Sergeant Rodriguez took hold of  Plaintiff Carpenter (Exhibit N, 1:39).

63.     Sergeant Rodriguez lifted plaintiff Carpenter several times as he attempted to get her towards the bank doors (Exhibit A, 64:20-25). Sergeant Rodriguez observed that plaintiff Carpenter continually dropped her weight as they walked (Exhibit G, ¶12).

64.     Plaintiff Carpenter indicated that when Sergeant Rodriguez placed her on her feet she did not have her "knees underneath" so she fell. She indicated that Sergeant Rodriguez would then have to pick her up again (Exhibit A, 64:20-25). Plaintiff Carpenter stated that she was just trying to get her "footing" (Exhibit A, 65:1-2).

65.     Chief of Patrol, James P. Hall, ("Chief Hall") having just arrived at the scene, observed Sergeant Rodriguez  attempt to place plaintiff carpenter under arrest (Exhibit E, 137:14-17).

66.     Sergeant Patrick Wright ("Sergeant Wright"); also having just arrived with Chief Hall, observed Sergeant Rodriguez struggling to get plaintiff Carpenter towards the front

of the bank (Deposition Transcript of Sergeant Patrick Wright, annexed to Anakhu Decl. as "Exhibit F" at 131:23-25).

67.     Sergeant Wright observed plaintiff Carpenter flailing as well as moving her body and it appeared to him that she was trying to get out of Sergeant Rodriguez's grip (Exhibit F, 131:8-11). Sergeant Wright also noted that plaintiff Carpenter was "throwing her weight around" (Exhibit F, 133:17-21).

68.     Chief Hall observed Sergeant Rodriguez involved in a "little bit of a tussle" with plaintiff Carpenter (Exhibit E, 134:14-19).

69.     Chief Hall approached Sergeant Rodriguez and plaintiff Carpenter. As he approached them, Chief Hall noticed Sergeant Rodriguez's shield by his waist area (Exhibit E, 137:4; Deposition Transcript of Chief of Patrol, James P. Hall, dated February 6, 2013, annexed to Anakhu Decl. as "Exhibit S" at 348:10-20).

70.     Once next to them, Chief Hall heard plaintiff Carpenter yelling while Sergeant Rodriguez instructed her to put her hands behind her back (Exhibit E, 140:16-23)

71.     It appeared to Chief Hall that plaintiff Carpenter was resisting arrest (Exhibit E, 183:6-7)  since he personally observed her refusing to place her hands behind her back after being ordered to do so by Sergeant Rodriguez (Exhibit E, 183:6-10).

72.     Sergeant Rodriguez escorted plaintiff Carpenter a few feet towards the bank where other officers assisted in effectuating her arrest. (Exhibit N, 1:51).

73.     Eventually, plaintiff Carpenter cooperated with Sergeant Rodriguez and admitted that she did not "put any more struggle into it" (Exhibit A, 68:3-5).

74.     Plaintiff Carpenter was arrested for criminal trespass and resisting arrest since she refused to leave the bank when instructed to do so (See New York City Police Department

Omniform System-Arrest Report for Heather Carpenter annexed to Anakhu Decl. as "Exhibit H").

75.     Plaintiff Carpenter was ultimately placed in plastic flex handcuffs (Exhibit A, 68:20-22). Plaintiff Carpenter was instructed by an officer to inform them if the handcuffs were too tight (Exhibit A, 70:6-8).

76.     Plaintiff Carpenter alleged that she verbalized, on at least two occasions, that the cuffs were too tight (Exhibit A,  70:19). Plaintiff Carpenter stated that the second time she verbally complained that the handcuffs were too tight, she made the statement "generally" while facing the bank wall (Exhibit A, 70:14-15). She was unsure as to whether any officer heard her (Id.).

77.     Plaintiff Carpenter believed that she was placed in a police van approximately fifteen minutes to twenty minutes after being arrested (Exhibit A, 71:12-14).

78.     Plaintiff Jimenez was also detained (Exhibit T, 165:19-21); however, while being escorted towards the entrance of the bank, plaintiff Jimenez began running (Exhibit T,156:18-20). Sergeant Newsom believed plaintiff Jimenez was attempting to evade arrest (Exhibit T, 167:8-18).

79.     Sergeant Wright also noticed that plaintiff Jimenez began running across the building line as plaintiff Carpenter was being escorted towards the bank entrance. (Exhibit F, 126:24-127:2; 140, 21-23).

80.     Sergeant Wright and other officers apprehended Plaintiff Jimenez near the front door of the bank. (Exhibit F, 155:15-18).

81.     As officers were attempting to effectuate his arrest, Plaintiff Jimenez grabbed  onto the right side of the bank's door frame with both hands (Exhibit B, 99:14-100:4). Plaintiff

Jimenez stated that he grabbed onto the door frame because he wanted to see what was going on with his girlfriend. (Exhibit B, 99:16-17).

82.     Chief Esposito still in the bank, heard a commotion in the bank vestibule (Exhibit D, 229:5-7). Chief Esposito turned towards the vestibule and observed plaintiff Jimenez struggling to break away from officers (Exhibit D, 229:10-11). He noted that plaintiff Jimenez was "flaring about" and trying to pull away from officers as he was being placed under arrest (Exhibit D,  229:19-21).

83.     Sergeant Wright observed plaintiff Jimenez resisting arrest (Exhibit F, 183:16-20). Sergeant Wright verbally instructed  Plaintiff Jimenez to stop resisting arrest as officers were attempting to place him in handcuffs (Exhibit F, 190:2-5; 247:18-21) .

84.     Plaintiff Jimenez alleged that he was punched on his leg and hit in his back by police officers while being brought back into the bank (Exhibit B, 102:22; 103:22). Plaintiff Jimenez said he did not see who punched him on his leg and hit him in his back. (Exhibit B, 104:6-7;104:12-14).

85.     Plaintiff Jimenez stated that he decided to let go of the door frame and comply with the officers' due to the for (Exhibit B, 101:2-3).

86.     Plaintiff Jimenez alleges he felt a sharp pain on the middle finger of his right hand and began bleeding (Exhibit B, 102:22-24; 105:6-7). Plaintiff Jimenez testified that he did not know who, how or what cut his finger (Exhibit B, 105:19-21; 106:2-3; 136:15-16).

87.     Plaintiff Jimenez was placed in plastic flex cuffs (Exhibit B, 108:17-18). After handcuffs were applied, plaintiff Jimenez requested medical attention for his finger (Exhibit B, 109:10-12).

88.     Plaintiff Jimenez was arrested for criminal trespass and resisting arrest since he

refused to leave the bank when instructed to do so. (See New York City Police Department

Omniform System-Arrest Report for Julio Jose Jimenez-Artunduaga, annexed to Anakhu

Decl. as "Exhibit I").

89.     Plaintiffs Carpenter and Jimenez were transported to Manhattan Central Booking

for processing (Exhibit Q, ¶ 61).

90.     Plaintiff Carpenter believed that she was held for approx thirty-two hours in police

custody (Exhibit Q, ¶ 62). Plaintiff Jimenez believed that he was held for approx thirty to

thirty one hours in police custody (Exhibit Q, ¶ 63).

91.     Plaintiff Carpenter alleged that she was bleeding on her left hand (Exhibit A, 81:2-

3). She believed she sustained a "minor" cut during the "scuffle of putting the [hand]cuffs

on" (Exhibit A, 81:4-9); however, she admitted that she was not entirely sure how the cut

occurred (Exhibit A, 81:10-11). She also admitted that she did not inform anyone about the

cut and did not seek any medical treatment for it (Exhibit A, 81:12-14).

92.     Plaintiff Carpenter also indicated that her right wrist hurt for approximately two

weeks after being hand cuffed (Exhibit A, 81:18-20).

93.     Plaintiff Carpenter did not request medical attention at any point while held in

police custody (Exhibit A, 71:8-9)

94.     Plaintiff Carpenter acknowledged that officers asked her if she would like medical

treatment; however, she declined (Exhibit A, 75:9-12).

95.     Plaintiff Jimenez requested and received medical attention while in police custody.

Although he declined to go to the hospital, he accepted a Band-Aid and aspirin from the

facility nurse (Exhibit B, 113:20-114:2).

96.     After her release, plaintiff Carpenter did not seek any medical treatment in connection with her arrest (Exhibit A, 80:2-4). However; she stated that she received general first aid from her aunt (Exhibit A, 80:5-21).

97.     Plaintiff Jimenez alleged he sustained a laceration on his right middle finger while officers affected his arrest (Exhibit B, 105:10-12). He testified that he does not have any visible scars from the incident (Exhibit B, 105:3-5).

98.     Plaintiff Jimenez also alleged he experienced pain in his leg  and limping for a week and a half after the incident (Exhibit B, 122:14-19); however, he testified that he did not seek any medical treatment any of his alleged injuries (Exhibit B, 122:11-13).

99.     Plaintiff Jimenez stated that he received general first aid from plaintiff Carpenter's aunt when they returned home. (Exhibit B, 122:6-10).

100.    Plaintiff Jimenez did not have any permanent physical injuries as a result of this incident (Exhibit B, 121:1-3).

Dated:      New York, New York
            June 14, 2013

                        MICHAEL A. CARDOZO
                        Corporation Counsel of the City of New York
                        *Attorney for Defendants City of*
                        *New York, Joseph Esposito and James Hall,*
                        *Sgt. Robert Byrne, Sgt. Christopher*
                        *Newsome, Sgt. Rodriguez and Sgt. Patrick*
                        *Wright*
                        100 Church Street
                        New York, New York 10007
                        (212) 356-2323

                By:     _____
                        Joy T. Anakhu
                        Special Assistant Corporation Counsel
                        Special Federal Litigation Division

TO:

Honorable Denise L. Cote
United States District Judge
500 Pearl Street
New York, New York 10007

Honorable Debra Freeman
United States Magistrate Judge
500 Pearl Street
New York, New York 10007

Lea Spiess, Esq.
Law Office of Ronald Kuby
Attorneys' for Plaintiffs
119 West 23rd Street, Suite 900
New York, NY 10011