UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
HEATHER CARPENTER and JULIO JOSE        :
JIMENEZ-ARTUNDUAGA,                     :
                       Plaintiffs,      :
                                        :        11 Civ. 8414 (DLC)
          -v-                           :
                                        :        OPINION AND ORDER
THE CITY OF NEW YORK, CHIEF OF          :
DEPARTMENT JOSEPH J. ESPOSITO, CHIEF    :
OF PATROL JAMES P. HALL, SGT. ROBERT    :
BYRNE, SGT. CHRISTOPHER NEWSOM, SGT.    :
RODRIGUEZ, and SGT. PATRICK WRIGHT,     :
                       Defendants.      :
                                        :
--------------------------------------- X

APPEARANCES:

For Plaintiffs:

Ronald L. Kuby and Leah Marielle Busby
Law Office of Ronald L. Kuby
119 West 23rd Street, Suite 900
New York, NY 10011


For Defendants:

Andrew Lucas
Assistant Corporation Counsel of the City of New York
New York City Law Department
100 Church Street
New York, NY 10077


DENISE COTE, District Judge:

     Plaintiffs Heather Carpenter ("Carpenter") and Julio Jose

Jimenez-Artunduaga ("Jimenez") filed this action pursuant to 42

U.S.C. § 1983 seeking compensatory and punitive damages against

six defendants: the City of New York ("the City"), Chief of
Department Joseph J. Esposito ("Chief Esposito"), Chief of
Patrol James P. Hall ("Chief Hall"), Sergeant Robert Byrne
("Sergeant Byrne"), Sergeant Christopher Newsom ("Sergeant
Newsom"), Sergeant Rodriguez ("Sergeant Rodriguez"), and
Sergeant Patrick Wright ("Sergeant Wright").  This case arises
out of an October 15, 2011 protest organized by a group known as
Occupy Wall Street, during which the plaintiffs were arrested
for criminally trespassing in a Manhattan Citibank branch.

The plaintiffs seek to impose civil liability under § 1983
on the four Sergeants for arresting them in violation of the
Fourth Amendment, and using excessive force in doing so.  The
remaining claims seek to hold the City and the two Chiefs
responsible under the Monell doctrine and as supervisors,
respectively.

On June 24, 2013, defendants moved for summary judgment.
Despite being granted repeated extensions, the plaintiffs failed
to file a complete set of papers in opposition to the summary
judgment motion within the time permitted.  Having examined the
record with care, summary judgment is granted in part.  The
false arrest claims are dismissed.  As to excessive force, only
the claims against the City are dismissed.

BACKGROUND

The following facts are undisputed or taken in the light most favorable to the plaintiffs unless otherwise indicated. This case arises out of a protest conducted by the Occupy Wall Street ("Occupy") movement. The Occupy movement explains that it came into being in September 2011, when it occupied Zuccotti Park, located near Wall Street in New York City's financial district. As relevant here, Occupy objects to the perceived greed of financial services institutions and their allegedly corrupt relationship with the government. Occupy organized a protest for October 15, 2011, which the New York City organizers called, in their Facebook post, a "Day of Action Against Banks." Through this Facebook post, Carpenter and Jimenez became aware of the October 15 protest.

During the evening prior to October 15, Carpenter visited Jimenez at the bar at which he worked and they discussed joining the protest. That night, Carpenter travelled to Zuccotti Park and joined the protestors. Jimenez joined her after he left work early on the morning of October 15. The couple slept for a few hours in Zuccotti Park.

On the afternoon of October 15, the plaintiffs arrived with other protestors at Washington Square Park, the staging ground for the Occupy protest. Carpenter intended to "participate" in

the Occupy protest that day by closing her Citibank bank account.  Carpenter had previously been notified by Citibank of a $17 monthly fee to maintain her account; Citibank had no such fee in the past.  The plaintiffs joined a group of approximately 30 to 35 Occupy protesters marching to a Citibank branch at 555 LaGuardia Avenue in Greenwich Village.  Defendant Sergeant Rodriguez was also in this group, dressed in plain clothes.

Sergeants Rodriguez, Newsom, and Byrne had attended a briefing the morning of October 15, in which the officers were advised of the Occupy protest planned for that day and told that the objective of the protesters was to "take over the banks." Sergeant Rodriguez learned at the briefing that some of the Occupy protesters were going to close their bank accounts as part of the protest.  All three Sergeants were sent to Washington Square Park.  As the protesters departed from Washington Square Park, a superior officer directed Sergeant Rodriguez to join the group and "blend in."  Superior officers directed Sergeants Newsom and Byrne to monitor the group.

On the walk to the Citibank branch, all or nearly all members of the group chanted Occupy slogans, such as "Banks got bailed out, we got sold out."  Both plaintiffs participated in the chanting.  Jimenez carried a video camera; he filmed the group walking to the branch, interviewing members of the group

4

as they walked.  Sergeant Rodriguez noticed both plaintiffs, Carpenter because of her red hair and Jimenez because he was videotaping.

At or around 2 p.m., the group entered the Citibank branch. They gathered in the main reception area and formed a circle. At that point, three members of the group began a "teach-in." Other members of the group aired their grievances about the banking system and shared personal stories on topics such as student debt.  The teach-in was audible to all those present in the bank branch.  Carpenter did not speak during the teach-in, but she did clap along with the group.  Jimenez walked through the area, filming the teach-in.  Sergeant Rodriguez observed both plaintiffs among the protesters.

At or around 2:04 p.m.,[1] a Citibank employee addressed the protesters.  She stated, "I'm asking you guys can you protest outside the branch.  No cameras are allowed inside the branch." A member of the group responded, "You guys have cameras inside the branch."  The Citibank employee then stated, "Respectfully, we're asking you to protest outside but not inside the branch." Both plaintiffs admit that they heard the statements by this first employee.  Less than one minute later, a second Citibank

---

[1] These times are estimated based on the time stamp of the video evidence in the record.

employee addressed the group one more time.  He said, "Guys, I kindly ask you if you could do this outside, but not inside the branch."  Jimenez admits he heard this statement as well. Despite these statements by bank employees, only a few of the protestors left the bank.  Carpenter and Jimenez were among those who remained in the bank.

While the remaining protesters continued with the teach-in, Carpenter closed her bank account.  Jimenez handed Carpenter her bank card, and she approached a teller.  When Jimenez attempted to film Carpenter's bank transaction, she told him not to. Jimenez then returned to filming the teach-in, which continued to take place within the bank.

Sergeant Rodriguez observed both plaintiffs remain in the bank after the bank employees had addressed the protestors, and he witnessed Jimenez handing the bank card to Carpenter.  From what he observed, Sergeant Rodriguez assumed that Carpenter was closing her bank account, since he had been advised in the briefing earlier that day that some of the Occupy protesters would be closing their accounts.

Jimenez and Carpenter exited the bank branch about four to five minutes after the bank employees asked the protesters to move their protest outside.  At about 2:08 p.m., Jimenez left the bank branch even though Carpenter had not yet completed her

bank transaction.  As Jimenez left, he shouted, "they're closing the doors."  Almost immediately thereafter the police shut the doors to the bank.

At about 2:09 p.m., Carpenter completed her transaction and moved to exit the bank branch.  Although there were police officers blocking people from leaving, Carpenter showed her receipt and was permitted to leave.  Carpenter and Jimenez found each other, walked over to the bank branch windows, and spent the next few minutes watching -- and later recording -- what was happening inside the branch.

What they witnessed was the police arresting the Occupy protesters in the bank branch.  A senior police officer told the protesters inside the branch that they were all under arrest for criminal trespass.  As the protesters inside the bank were being placed under arrest, Sergeant Rodriguez looked out of the bank windows and recognized Carpenter and Jimenez.  He informed Chief Esposito that there were two additional protesters who had been involved in the demonstration outside the bank.  Chief Esposito authorized their arrest, and Sergeant Rodriguez left the bank branch, accompanied by Sergeant Newsom, to arrest the plaintiffs.

Around 2:15 p.m., Sergeant Rodriguez approached Carpenter. Many of the facts regarding what transpired at this point are

disputed.  It is undisputed, however, that Sergeant Rodriguez approached Carpenter as she held her iPhone and recorded what was happening inside the branch.  He stated that she was "inside with the rest of them" and that she would have to "come with him."  Carpenter repeatedly stated that she was a "customer," pointing to the receipt from her transaction.  Jimenez identified himself as Carpenter's boyfriend or fiancé, said something along the lines of "let's go," and then placed his arm behind Carpenter's back, as if to guide her away from Sergeant Rodriguez.  Sergeant Rodriguez then grabbed Carpenter from behind and moved her to the front of the bank.  Chief Hall, who had just arrived on the scene, assisted Sergeant Rodriguez by grabbing Carpenter's arm and helping Rodriguez direct her to the wall of the bank branch, where Rodriguez then handcuffed her.

At virtually the same time, Jimenez was arrested.  Sergeant Newsom and Sergeant Wright, who had just arrived, brought Jimenez into the bank vestibule.  As Jimenez was being brought inside the vestibule, he grabbed and held onto the doorframe for a few seconds.  Inside the vestibule, additional officers helped arrest Jimenez.

On June 21, 2011, plaintiffs filed this action, asserting that they had been falsely arrested and subjected to excessive force during those arrests.  Following the completion of

discovery, the defendants moved for summary judgment on June 24, 2013.  The plaintiffs only filed exhibits and seven pages of a Rule 56.1 Statement by the extended deadline for the plaintiffs' submission of opposition papers.[2]  The defendants filed a reply to these submissions on September 20.


DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).

---

[2] On August 21, the parties were notified that only those submissions of the plaintiffs filed through the Court's ECF system by July 30 would be deemed filed in opposition to the motion for summary judgment.  On September 3, plaintiffs' counsel submitted a memorandum in opposition to summary judgment which is dated July 26.  That document and a 75-page Rule 56.1 Statement were not properly filed in this action for the reasons explained in a September 6 Order.  Consideration of those documents would not, however, alter the outcome of this motion.

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings.  Rule 56(e), Fed. R. Civ. P.; see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The plaintiffs bring two Fourth Amendment claims pursuant to 42 U.S.C. § 1983.  To sustain a Section 1983 claim, the plaintiff must show that he was "deprived of rights, privileges, or immunities secured by the Constitution and laws [of the United States]" by a person acting under color of state law. Burg v. Gosselin, 591 F.3d 95, 97 (2d Cir. 2010) (citation omitted).  That an individual officer committed a constitutional violation is not sufficient, however, to establish liability

10

under § 1983 because these officers are further protected by the doctrine of qualified immunity.

As the Supreme Court recently reiterated,

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U. S. 800, 818 (1982)).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011)(quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  "We do not require a case directly on point" before concluding that the law is clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate."  al-Kidd, 131 S. Ct. at 2083.

Stanton v. Sims, 2013 WL 5878007, at *2 (U.S. Nov. 4, 2013) (per curiam).  A court may resolve the qualified immunity question first, but it is often appropriate to begin by determining whether an official has violated a constitutional right.

Pearson v. Callahan, 555 U.S. 223, 236 (2009).  In this case, the plaintiffs contend that the individual defendants violated their Fourth Amendment rights by (1) falsely arresting them and (2) using excessive force in the course of those arrests.

11

1. False Arrest Claims

     Defendants assert that no false arrest occurred because the arresting officers had probable cause to believe that the plaintiffs committed criminal trespass.[3]  In assessing Fourth Amendment claims of false arrest brought under § 1983, courts look to the law of the state in which the arrest occurred. Russo v. City of Bridgeport, 479 F.3d 196, 203 (2d Cir. 2007). Under New York state law, a claim of false arrest requires a showing that the confinement was not privileged.  Liranzo v. United States, 690 F.3d 78, 96 (2d Cir. 2012).  Where probable cause for the arrest exists, an arrest by a law enforcement officer is privileged.  Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013).

     The requirement of probable cause does not create a high bar for law enforcement.  "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the

_____

[3] Defendants also argue that the arresting officers had probable cause to arrest defendants for obstructing governmental administration under N.Y. Pen L. § 195.05.  Because probable cause existed to arrest the defendants for criminal trespass, it is unnecessary to reach the question of whether probable cause also existed to arrest them for obstructing governmental administration.

belief that the person to be arrested <u>has committed or is
committing a crime</u>." <u>Id.</u> (citation omitted).  "The inquiry is
limited to whether the facts known by the arresting officer at
the time of the arrest objectively provided probable cause to
arrest." <u>Id.</u> (citation omitted).

When assessing an individual's state of mind as part of a
probable cause determination, police officers are granted
"great" "latitude" "because the practical restraints on police
in the field are greater with respect to ascertaining intent."
<u>Zalaski v. City of Hartford</u>, 723 F.3d 382, 393 (2d Cir.
2013)(citation omitted).  In <u>Zalaski</u>, the Court of Appeals
concluded that the arresting officers were entitled to qualified
immunity where there was "arguable probable cause for a
reasonable officer to think that the plaintiffs were engaged in
the sort of disorderly conduct proscribed" by statute.  <u>Id.</u> at
394.  The statute required proof that the arrest person had
acted with the "predominant intent" to cause inconvenience.  <u>Id.</u>
at 391.  The Court of Appeals concluded that the arresting
officers were entitled to make a judgment regarding that intent
based on the totality of the circumstances.  <u>Id.</u> at 393.

Additionally, where multiple officers cooperate in an
investigation, the "collective knowledge doctrine" applies to
the determination of probable cause.

13

> The collective knowledge doctrine provides that, for
> the purpose of determining whether an arresting
> officer had probable cause to arrest, "where law
> enforcement authorities are cooperating in an
> investigation, the knowledge of one is presumed shared
> by all."

Savino v. City of New York, 331 F.3d 63, 74 (2d Cir.

2003)(quoting Illinois v. Andreas, 463 U.S. 765, 772 n.5

(1983)); see Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir.

2007)(applying the collective knowledge doctrine in the § 1983

context).  "[S]ummary judgment dismissing a plaintiff's false

arrest claim is appropriate if the undisputed facts indicate

that the arresting officer's probable cause determination was

objectively reasonable."  Jenkins v. City of New York, 478 F.3d

76, 88 (2d Cir. 2007).

Under N.Y. Pen. L. § 140.05, it is an act of criminal

trespass when an individual "knowingly enters or remains

unlawfully in or upon premises."[4]  The statute defines "enter or

remain unlawfully" as follows:

> A person "enters or remains unlawfully" in or upon
> premises when he is not licensed or privileged to do
> so. A person who, regardless of his intent, enters or
> remains in or upon premises which are at the time open
> to the public does so with license and privilege
> unless he defies a lawful order not to enter or

---

[4] Defendants also cite N.Y. Pen. L. § 140.10(a), which is
criminal trespass in the third degree.  Section 140.10(a)
imposes higher penalties on those who commit trespass "in a
building or upon real property which is fenced or otherwise
enclosed in a manner designed to exclude intruders."

14

remain, personally communicated to him  by the owner
of such premises or other authorized person.

N.Y. Pen. L. § 140.00(5).

Where, as here, the alleged trespass occurred on premises
generally open to the public, the State has the burden of
proving three elements to support a prima facie case of criminal
trespass: (1) that a lawful order excluding the defendant from
the premises was issued, (2) that the order was communicated to
the defendant by a person with authority to make the order, and
(3) that the defendant defied that order.  People v. Munroe, 853
N.Y.S.2d 457, 458 (3d App. Div. 2007).  An individual accused of
criminal trespass may raise as a defense that he "honestly
believe[d] that he [wa]s licensed or privileged to enter."
People v. Basch, 365 N.Y.S.2d 836, 840 (1975).  It is generally
left to a jury to assess the credibility of this defense.  See,
e.g., People v. Jackson, 831 N.Y.S.2d 596, 598 (3d App. Div.
2007).

An arresting officer has no duty to investigate exculpatory
defenses, or to assess the credibility of claims regarding
exculpatory defenses.  "Once a police officer has a reasonable
basis for believing there is probable cause, he is not required
to explore and eliminate every theoretically plausible claim of
innocence before making an arrest."  Panetta v. Crowley, 460

15

F.3d 388, 396 (2d Cir. 2006)(citation omitted).  On the other hand, the officer may not "deliberately disregard facts known to him which establish" an exculpatory defense.  Jocks v. Tavernier, 316 F.3d 128, 136 (2d Cir. 2003).  Indeed, an officer's awareness of the facts supporting an exculpatory defense may eliminate probable cause.  Id. at 135.  Probable cause is not eliminated, however, by the mere existence of evidence that could permit a conclusion of innocence.  "[O]nce officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury.  Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence."  Panetta, 460 F.3d at 396 (citation omitted).

The defendants have shown through the admissions of the plaintiffs and other undisputed evidence that the arresting officers had probable cause to believe that the plaintiffs committed the crime of criminal trespass.  The plaintiffs have not presented evidence that raises a material dispute of fact regarding the officers' knowledge of conduct supporting the elements of the crime of trespass.  The defendants have therefore shown that they are entitled to summary judgment on the false arrest claims.

16

A reasonable police officer was entitled to conclude that the statements of the bank employees delivered to the protestors were lawful orders excluding the protestors from continuing protest activities within the bank's premises.[5] A reasonable police officer was also entitled to conclude that the statements were communicated by persons authorized by the bank to make them and that they were effectively communicated to the plaintiffs. Each of the plaintiffs has admitted hearing at least one of the statements by the bank employees.  Finally, a reasonable officer would also be entitled to conclude that each of the plaintiffs was a protester and was in violation of those orders.

It is only this final element of the trespass violation that requires further discussion.  The police had observed both plaintiffs engage in protest activities with a group of protestors.  This included marching with them, chanting and clapping with them, joining the circle during the teach-in, and in the case of Jimenez, videotaping the protest.  The protest activities of the group which the plaintiffs had joined

---

[5] In making their statements to the protestors, the bank employees did not ask protestors to leave.  Instead, they asked them to take their protest activities outside the bank. Therefore, to support an arrest based on the charge of trespass, there had to be a reasonable basis for a police officer to find that a protestor continued to engage in an act of protest within the bank.

continued after the bank employees asked them to take their
protest activities outside.  Virtually all of the protestors
remained in the bank.  As for the plaintiffs, neither of them
left the bank at that point either.  Both of them stayed for
about four to five minutes more.  During this interval Jimenez
continued shooting video footage of the protest, something that
the protestors had been told explicitly was not allowed.  The
plaintiffs have not offered evidence to create a genuine
question of fact as to whether the officers were entitled to
believe that Jimenez was a protester who continued to engage in
protest activity within the bank premises after he was no longer
permitted lawfully to do so.

While Jimenez continued with his videotaping, Carpenter
took steps in this interval to close her bank account.  She
retrieved her bank card from Jimenez, entered into a transaction
with a bank teller, and then left the bank.  Sergeant Rodriguez
had been told that protestors would be closing their bank
accounts as part of a plan to occupy banks, and had concluded
that Carpenter was closing a bank account in accordance with the
plans of the Occupy movement.  Based on undisputed facts, he was
entitled to conclude that she was a protester, that her license
to remain on the premises had been revoked, and that she

disobeyed the bank's employees by continuing to engage in an act of protest within the bank's premises.

Closing a bank account is, of course, lawful activity. There is no suggestion that it would have been unlawful for Carpenter to go to any other Citibank branch that day to close her account.  But, given the facts as they appeared to the arresting officers, it was reasonable for them to conclude that Carpenter's decision to remain in that Citibank branch and move to a teller's window to engage in a banking transaction was a decision to continue to engage in protest activity in defiance of the bank employees.  To the extent that there is any doubt in this regard, the defendants would be entitled to qualified immunity for the decisions they made in arresting Carpenter.

Carpenter presents one argument in opposition to this motion.  She asserts that she was not a protester but was merely an observer of the protest.[6]  This argument fails to raise a question of fact that would prevent summary judgment.  First, this argument is at odds with the many admissions that Carpenter made during her deposition.  In any event, the issue is not what Carpenter intended by her actions, but what it was reasonable for the arresting officers collectively to understand from

---

[6] This argument is made in the plaintiffs' seven-page Rule 56.1 Statement.

observing Carpenter's behavior.  They were entitled, as
described above, to believe that Carpenter was an active
participant in the protest activity and actively working with
other protestors to disrupt regular bank activity.

Nor were the arresting officers required to investigate
Carpenter's explanation that she was a customer and her denial
that she had been inside "with" the protesters.  The issue in
this case is whether there was a reasonable basis for the
arresting officers to conclude that Carpenter was a protester,
that she had chosen to stay in the bank branch after the bank
employees asked the protestors to take their protest activities
outside, and that she then engaged in another act in furtherance
of the protest.  Here, the arresting officers had probable cause
to believe that Carpenter committed a crime, and had no duty to
investigate an exculpatory defense, particularly one that would
require the officers to evaluate Carpenter's intent.  Panetta,
460 F.3d at 396; Jocks, 316 F.3d at 136.


2. Excessive Force Claims

The plaintiffs have also brought claims of excessive force.
Police officers' application of force is excessive, in violation
of the Fourth Amendment, if it is "objectively unreasonable in
light of the facts and circumstances confronting them, without

regard to the officers' underlying intent or motivation."
Papineau v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006) (citation
omitted).  Determining whether excessive force has occurred
requires a court to weigh the "facts and circumstances of each
particular case, including the crime committed, its severity,
the threat of danger to the officer and society, and whether the
suspect is resisting or attempting to evade arrest."  Id.
(citation omitted).

While "not every push or shove" permits a Fourth Amendment
claim to survive summary judgment, bruising and other
nonpermanent injuries may be sufficient.  Maxwell v. City of New
York, 380 F.3d 106, 108 (2d Cir. 2004); Robison v. Via, 821 F.2d
913, 924 (2d Cir. 1987) ("If the force used was unreasonable and
excessive, the plaintiff may recover even if the injuries
inflicted were not permanent or severe.").  "Given the fact-
specific nature of the inquiry, granting summary judgment
against a plaintiff on an excessive force claim is not
appropriate unless no reasonable factfinder could conclude that
the officers' conduct was objectively unreasonable."  Amnesty
Am. v. Town of W. Hartford, 361 F.3d 113, 123 (2d Cir. 2004).

Carpenter complains that Sergeant Rodriguez gratuitously
grabbed her breasts during the arrest and that her handcuffs
were too tight resulting in minor injury.  Jimenez alleges that

arresting officers punched and kicked him and that his finger

began to bleed.  Although these allegations are disputed, they

raise issues of fact which may only be resolved by a jury.[7]


3. Monell Liability against City

The plaintiffs further seek to hold the City responsible

pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

"Section 1983 'imposes liability on a government that, under

color of some official policy, causes an employee to violate

another's constitutional rights.'"  Okin v. Village of Cornwall-

on-Hudson Police Dep't, 577 F.3d 415, 439 (2d Cir. 2009)

(quoting Monell, 436 U.S. at 692).

> Monell does not provide a separate cause of action for
> the failure by the government to train its employees;
> it extends liability to a municipal organization where
> that organization's failure to train, or the policies
> or customs that it has sanctioned, led to an
> independent constitutional violation.

Id. (citation omitted).  As a result, to state a Monell claim

against a city for the unconstitutional actions of its

employees, "a plaintiff is required to plead . . . three

elements: (1) an official policy or custom that (2) causes the

---

[7] Jimenez names three defendants -- Sergeants Newsom, Wright, and
Byrne -- in his excessive force claim.  There is no evidence in
the record that Sergeant Byrne was involved in executing
Jimenez's arrest.

plaintiff to be subjected to (3) a denial of a constitutional right." Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007). An "official policy or custom" may be established through the official acts of city lawmakers or "those whose edicts or acts may fairly be said to represent official policy," Monell, 436 U.S. at 694, or by a pattern of misconduct that is "sufficiently persistent or widespread" as to "compel[] the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." Reynolds v. Guiliani, 506 F.3d 183, 192 (2d Cir. 2007).

Plaintiffs have introduced no evidence to create a triable issue of fact as to Monell liability as to either constitutional violation. Regarding the false arrest claims, because it has been determined that the arrests were supported by probable cause, there can be no Monell liability for these claims. Regarding the excessive force claims, even though these claims survive summary judgment, plaintiffs have introduced no evidence that the excessive force allegedly used by the individual defendants is part of an "official policy or custom" of the City of New York. Accordingly, the Monell claims are dismissed in their entirety.

23

4. Supervisory Liability Against Supervisor Defendants

The plaintiffs also seek to hold the supervisor defendants, Chief Esposito and Chief Hall, liable for the alleged constitutional violations.  It is well established that general respondeat superior liability does not exist under Section 1983. Back v. Hastings on Hudson Union Free School Dist., 365 F.3d 107, 127 (2d Cir. 2004).  An individual supervisor can be held liable, however, if the plaintiff establishes the "defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013). Examples of such personal involvement include directly participating in the infraction, and creating a policy or custom under which unconstitutional practices occurred, or allowing such a policy or custom to continue.  See id. at 139.[8]

_____

[8] In Hastings on Hudson, 365 F.3d 107, the Second Circuit held that personal involvement may be shown by

> evidence that: (1) the defendant participated directly in
> the alleged constitutional violation, (2) the defendant,
> after being informed of the violation through a report or
> appeal, failed to remedy the wrong, (3) the defendant
> created a policy or custom under which unconstitutional
> practices occurred, or allowed the continuance of such a
> policy or custom, (4) the defendant was grossly negligent
> in supervising subordinates who committed the wrongful
> acts, or (5) the defendant exhibited deliberate
> indifference . . . by failing to act on information
> indicating that unconstitutional acts were occurring.

The analysis of the supervisory liability claims in this case turns on the underlying constitutional claims against the individual officer defendants.  Because summary judgment is granted to the individual officer defendants on the false arrest claims, it is also granted to the supervisor defendants on these claims.  As to the excessive force claims, however, plaintiffs have raised a genuine question of material fact as to the existence of a constitutional violation.  The question then is whether plaintiffs have raised a genuine question of material fact as to the existence of supervisory liability.

They have done so here, because the plaintiffs have submitted sufficient evidence to show that both Chief Esposito and Chief Hall either were present for or partook in the alleged constitutional violations.  If the plaintiffs prevail in demonstrating that the arresting officers used excessive force, a jury could also conclude that Chief Esposito and Chief Hall

Id. at 127 (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).  The Supreme Court's decision in Iqbal, 556 U.S. 662, which found that a supervisor can be held liable only "through the official's own individual actions," id. at 676, arguably casts doubt on the continued viability of some of the categories set forth in Hastings on Hudson and Colon.  See Grullon, 720 F.3d at 139 (recognizing that Iqbal "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations").  For the purposes of this case, however, it is not necessary to explore this issue because Chief Esposito and Chief Hall were personally involved in the arrest of both plaintiffs.

are responsible for these constitutional violations in their supervisory capacity.  Accordingly, the excessive force claims against the supervisor defendants survive summary judgment.


CONCLUSION

Defendants' summary judgment motion of June 14, 2013 is granted in part.  The City is dismissed as a defendant.  As to the individual defendants, only the excessive force claims survive.


SO ORDERED:

Dated:    New York, New York
          November 27, 2013

_____
                  DENISE COTE
          United States District Judge